IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 27, 2019

**STATE OF TENNESSEE v. KHYREE THOMPSON**

**Appeal from the Criminal Court for Hamilton County**
**No. 296577   Don W. Poole, Judge**

_____

**No. E2018-01481-CCA-R3-CD**

_____

Defendant, Khyree Thompson, appeals his convictions of first-degree felony murder and attempted especially aggravated robbery, for which he received an effective sentence of life in prison. On appeal, Defendant argues that the evidence is insufficient to support his convictions and that the State committed prosecutorial misconduct during its closing argument. Upon our review of the record, we affirm the judgments of the trial court.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and J. ROSS DYER, JJ., joined.

Donna Miller (on appeal) and Rex Sparks (at trial), Chattanooga, Tennessee, for the appellant, Khyree Donte Thompson.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Neal Pinkston, District Attorney General; and Andrew Coyle and Cameron Williams, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

On October 28, 2015, Defendant and two codefendants, Tabitha Garrison and Verronta Page, were indicted by the Hamilton County Grand Jury for one count of first degree felony murder and one count of attempted especially aggravated robbery. On July 26, 2016, the State filed a motion to sever Defendant's case from his codefendants, which

was granted by the trial court. Trial commenced on November 15, 2016, at which the following facts were adduced.

Pradip Patel, the manager of the Cascade's Motel, testified that on the morning of February 20, 2015, as he was walking around the property, he noticed that the door of Room 48 was wide open. He said "hello," but nobody responded. He saw blood on the bed, so he called 911. Mr. Patel testified that the room was rented in the name of Reginald Ballard, the victim in this case.

Tamika Bonner, the victim's aunt, testified that the victim went by the nickname Tez. The victim had just received a tax refund of approximately $4000. Ms. Bonner last saw the victim the night before he died when he came over to her house around 9:30 or 10:00 p.m. The victim brought over a bottle of liquor for his uncle and ate some pizza with his younger cousins. When he left, Ms. Bonner saw from the camera in her bedroom that there was a white female sitting in the passenger side of the victim's car.

Bruce Wayne Ross, a patrolman for the East Ridge Police Department, testified that on February 20, 2015, he received a call from dispatch to respond to the Cascade's Motel based on a report of an unconscious party in Room 48. The door to the room was open. Officer Ross recalled seeing an unmade bed with blood on the covers and that the television was on and loud. As he made his way around the room, Officer Ross discovered a black male lying on his side on the floor between the bed and the nightstand. Medical personnel responded while Officer Ross secured the scene. On cross-examination, Officer Ross agreed that he spoke to a witness who lived in a house across the street from the motel. However, Officer Ross was only "vaguely familiar" with the witness's report of seeing a woman running from the motel room the night before.

Detectives Julius Johnson and Daniel Stephenson processed the crime scene and collected evidence. Two cartridge casings were found on top of the bed. One bullet went through the mattress and was found in the bottom of the box spring. The other was eventually found flattened against the concrete floor underneath the carpet where the victim had been lying. A live round of 9 millimeter ammunition was found at the foot of the bed and another was found on the sidewalk just outside of Room 47, which was next to Room 48. A flip-flop was discovered in a "grassy area at the edge of the motel just a few doors down from [R]oom 48," and a second flip-flop was discovered in the parking lot of the Family Dollar next door. The victim's wallet was found between the mattress and the box spring and contained $4104 in cash. A handprint, which was later determined to be Defendant's, was found on the outside of the door to Room 48. No other identifiable fingerprints were found.

The victim's cell phone was recovered from the motel room. The phone contained messages on Facebook Messenger between the victim and a woman named Tabitha

Garrison close in time to the victim's death on February 19, 2015. The messages discussed meeting up with each other, and the victim indicated that he had gotten a place to stay. The victim sent Ms. Garrison a photograph of a large sum of money in his lap, presumably to impress.

Detective Stephenson used social media to assist in identifying Ms. Garrison. He was able to locate her in Dayton, Tennessee, on March 26, 2015, at the home of Promise Mathis. Ms. Garrison agreed to speak to Detective Stephenson at the Dayton Police Department and to provide a DNA sample. However, she did not provide any useful information during that interview and was not arrested at that time. On April 14, 2015, Detective Stephenson received a call from the Dayton Police Department that Ms. Mathis was in custody and had information on the Cascade's Motel murder. She identified Defendant, Ms. Garrison, and Verronta Page as suspects. Ms. Garrison was subsequently arrested in Dayton, Tennessee; Mr. Page in Knoxville, Tennessee; and Defendant in Junction City, Kansas. Ms. Garrison gave a second statement providing detailed information about the victim's murder.

On cross-examination, Detective Stephenson testified that Ms. Garrison was not very forthcoming during her first statement and that she later explained she was scared Defendant or his associates would hurt her family. Detective Stephenson testified that he did not know whether Ms. Garrison and Mr. Page were in a gang. Detective Stephenson admitted that he did not know if any property was taken from the victim.

Promise Mathis testified that she was best friends and roommates with Ms. Garrison and that she had been friends with Mr. Page since middle school. Ms. Mathis met Defendant through Ms. Garrison about six or seven months prior. Ms. Mathis did not know the victim, but she saw him pick up Ms. Garrison from an apartment in Dayton, Tennessee, on the night of February 19, 2015. Defendant and Mr. Page were also at the apartment that night. Before the victim arrived, Ms. Mathis heard Defendant and his two codefendants discussing their plan to rob him. Ms. Garrison was to go with the victim, and Defendant and Mr. Page were to meet her later at the motel. Defendant and Mr. Page asked Ms. Mathis to drive them to the motel, but she declined. Ms. Mathis parted ways with Defendant and Mr. Page when they left to find another ride. When Ms. Mathis saw the defendants again a couple of days later, Defendant and Ms. Garrison were acting normally, but Mr. Page was acting like "he was scared about something." Ms. Mathis then got into an argument with Defendant: "I told him he wasn't about that life and he popped off and said he already had a crip under his belt and for me to look on Tez's timeline" on Facebook. Ms. Mathis did so and saw several messages from people saying "rest in peace."

Ms. Mathis was subsequently arrested by the Dayton Police Department for questioning about an unrelated vandalism, which also involved Ms. Garrison. During her

interrogation, Ms. Mathis yelled at Ms. Garrison that "she was a f***ed up individual for setting up a murder." Ms. Mathis gave a recorded statement and a handwritten note regarding the Cascade's Motel murder. There was a detective from the East Ridge Police Department present. While giving her statement, Ms. Mathis identified a photograph of a flip-flop as one that she had recently purchased for Ms. Garrison. On cross-examination, Ms. Mathis admitted that she had convictions for misdemeanor theft and vandalism. She denied making any agreement with the State in exchange for her testimony.

Co-defendant Verronta Page testified that he was charged with first degree murder and attempted especially aggravated robbery in connection with this case along with other unrelated charges. Mr. Page testified that the State had not made any offers in exchange for his testimony. However, the State had agreed not to use his testimony or any evidence discovered as a result of his testimony against him. Mr. Page had also testified at the preliminary hearing.

Mr. Page testified that he had met Ms. Garrison about two or three months prior to this incident and Defendant about one or two months prior. Mr. Page did not know the victim. During the day on February 19, 2015, Ms. Garrison had been in contact with the victim, and the victim "wanted to come and spend some money on her." Ms. Garrison sent Defendant a picture of money in the victim's lap that the victim had sent to her through Facebook. Defendant showed the picture to Mr. Page and said "Look at all that money." Mr. Page agreed "Hell, yeah, that's a lot of money," to which Defendant responded that he was "fixing to get this money."

That evening, all of the defendants, along with Ms. Mathis and several other people, were at an apartment in Dayton, Tennessee. Ms. Garrison asked the other defendants what she should do, and they "just put together a robbery." Ms. Garrison gave the victim directions to the apartment, and the victim arrived in his car around 9:30 or 10:00 p.m. The victim knew Defendant, so they talked while Ms. Garrison was inside getting ready. Ms. Garrison then left with the victim. Mr. Page testified that the plan was for Ms. Garrison to call them when she knew where she and the victim were going, and then Mr. Page and Defendant would "just rob the man and leave."

Ms. Garrison called Mr. Page and told him that she and the victim were on their way to Chattanooga. Approximately thirty minutes later, as Mr. Page and Defendant were preparing to leave, Ms. Garrison sent a message asking where they were and telling them "hurry up because he's fixing to rape me, and she felt uncomfortable, so she wanted us to hurry up." As they got closer, Mr. Page asked Ms. Garrison what room she was in, she told them Room 48, and Mr. Page told her to wait outside. Mr. Page and Defendant were both in a car being driven by Page's friend, Josh Davis. When they got to the Cascade's Motel, they initially could not find the room because it was on the back side of the building.

When they drove around to the back, they saw Ms. Garrison sitting on the curb. Mr. Page asked if she was okay because she had mentioned the victim trying to rape her, and Ms. Garrison said she was fine. Defendant asked Ms. Garrison to point out the room, which she did. Defendant tried the doorknob, but it was locked. Ms. Garrison then knocked on the door while Defendant and Mr. Page hid behind a wall. The victim let Ms. Garrison into the room, and she left the door cracked open behind her. Defendant ran up and barged through the door, and Mr. Page followed him. Mr. Page was armed with a .45 caliber pistol, and Defendant had "a little black gun, probably about a 9mm." They had covered their faces with bandanas, and they were both shouting "what's up, what's up, give me the money, give me the money." Defendant put his gun in the victim's face. The victim reached for the gun, and they began fighting over it. Defendant told Mr. Page, "Little homie, go on, find the money." However, Mr. Page became "spooked" by Defendant and the victim fighting over the gun, so he ran out of the room.

Mr. Page was talking with Mr. Davis outside when he heard "bangs, probably about two or three of them." Ms. Garrison then came running out of the room crying. Mr. Page looked into the room and saw Defendant standing over the victim with "something like fire come off his hands." They all ran to Mr. Davis's car and left the scene. Ms. Garrison was crying, Mr. Page was sick to his stomach and threw up, but Defendant "acted like it didn't even faze him." Defendant said "if they catch me, I'm going to take my 20 years."

On cross-examination, Mr. Page denied being a member of the Bloods and said that it was just a coincidence that he had dog paw tattoos on his face. Mr. Page denied being the person who shot the victim in the chest. Mr. Page did not know if the State would offer him a plea deal after he testified. Mr. Page agreed that he went to the motel armed with a gun with the intent to steal from the victim but that he did not actually steal any property from the victim. Mr. Page testified that after the victim was shot, he fell off the bed and sounded like he was snoring. Mr. Page agreed with defense counsel that there was a possibility that after Defendant shot the victim and the group left, someone else could have entered the motel room and caused the victim's death before his body was discovered the following morning.

Dr. James Metcalfe, the medical examiner for Hamilton County, testified that the victim's cause of death was gunshot wounds to the chest and neck. The gunshot wound to the chest entered on the left side, went through the left lung and left ventricle of the heart, and exited on the lower left side of the victim's back. The damage to the heart and lung would have been fatal within a "very few minutes" due to internal blood loss. The stippling around the gunshot wound on the chest indicated that the gun was less than six inches away when fired. The other gunshot wound went through the victim's neck from right to left. That wound would not have been fatal because the bullet passed through

mostly muscle without hitting any major arteries or the spinal cord. The lack of stippling indicated that the gun was "more than a couple of feet" away when fired.

Derek Proctor, a forensic scientist with the Tennessee Bureau of Investigation (TBI), tested several items associated with this case for DNA. The victim's semen was found on a washcloth in the motel room. A mixture of the victim's and Ms. Garrison's DNA was found on a cigarette butt. Ms. Garrison's DNA was also found underneath the victim's fingernails. Defendant's DNA was not found on any of the items submitted for testing.

Jessica Hudson, a firearms examiner with the TBI, examined the cartridge cases, bullets, and live rounds found at the scene in this case, all of which were Tulammo 9 millimeter ammunition. The spent cartridge casings were fired by the same gun and had markings consistent with a Hi-Point 9 millimeter semiautomatic handgun. One bullet and one of the bullet fragments were fired by the same gun and also had markings consistent with a Hi-Point 9 millimeter. The other bullet fragment was too damaged to be able to compare its markings, but it had similar class characteristics to the undamaged bullet.

Defendant recalled Detective Stephenson to ask questions about a statement made by a witness named Tony Spradley. Detective Stephenson testified that he received some information from Mr. Spradley, who lived a few blocks away from the Cascade's Motel and had been awoken in the middle of the night by a noise. However, Detective Stephenson could not corroborate the details of Mr. Spradley's statement with other evidence and witness statements. Other witnesses at the motel also heard sounds like gunshots, furniture hitting the wall, and the brakes of a vehicle. Detective Stephenson was not able to locate a female based on Mr. Spradley's vague description.

Audrey Powell, Defendant's grandmother, testified that Defendant was born and raised in the small town of Junction City, Kansas. Defendant and his family moved to Chattanooga when he was 14 years old. She described Defendant as "really book smart" and not a troublemaker. Ms. Powell testified that Defendant had never been arrested or prosecuted in juvenile court in either Kansas or Tennessee. Ms. Powell testified that Defendant's great-grandmother passed away in January 2015, and he returned to Junction City, Kansas, soon thereafter to pay his respects.

On cross-examination, Ms. Powell admitted that she was aware that Defendant had pled guilty to vandalism and was on probation in February 2015. Ms. Powell admitted that Defendant violated his probation when he returned to Kansas in April 2015, three months after his great-grandmother had passed away. Ms. Powell was not aware that Defendant had been arrested in Kansas for possession of a firearm or that he provided a false name and address when he registered at a hotel there.

Kyonna Thompson, Defendant's sister, testified that Defendant was friends with the victim and that she was not aware of any problems or conflicts between them. She testified that Defendant, who was 19 years old at the time of the victim's death, could sometimes be influenced by older people, but sometimes he was a leader. Ms. Thompson did not know Defendant to carry a weapon or to be a member of a gang. On cross-examination, Ms. Thompson testified that she was not aware that Defendant was arrested in Kansas in possession of a .22 caliber Colt firearm. Ms. Thompson was also not aware that in January 2015, Defendant participated in the Violence Reduction Initiative, a community program for gang members.

Defendant called co-defendant Tabitha Garrison, who was also charged with first degree felony murder and attempted especially aggravated robbery in this case, but she asserted her Fifth Amendment right not to testify. The trial court declared her unavailable. Apparently against the advice of counsel, Defendant insisted that her preliminary hearing testimony be entered into evidence.

Ms. Garrison testified at the preliminary hearing that she did not have an agreement with the State other than that her testimony would not be used against her. Ms. Garrison testified that she had known Defendant and Mr. Page for a few months. Ms. Garrison had met the victim through Facebook. The victim sent her a picture of a lot of money in his lap, including hundreds, and said that he wanted to spend money on her. Ms. Garrison showed the picture to Defendant and Mr. Page, and they said "hell, yeah, do it, let him spend money on you." The victim came over that night, and there were a lot of people at the house. Ms. Garrison was upstairs getting ready while Defendant and Mr. Page talked to the victim. Ms. Garrison said that Defendant shook the victim's hand "because they were on the same . . . [g]ang set."

Ms. Garrison left with the victim. After making a few stops, including having sex down by the river and stopping at a house to deliver a bottle of liquor, they eventually went to the Cascade's Motel, and the victim paid for a room. Ms. Garrison called Mr. Page to tell him where she was, and he was supposed to come pick her up when she was done "hanging out" with the victim. Ms. Garrison knew someone would be coming with Mr. Page because he did not drive. Ms. Garrison and the victim had sex in the motel room. Later, as she was coming out of the bathroom, Ms. Garrison heard a knock at the door. The victim went to answer the door, and Defendant and Mr. Page forced their way inside. They were both armed with guns, had bandanas on their faces, and said "[w]hat's up and give me the money." The victim backed onto the bed and put his hands up. Ms. Garrison testified that Mr. Page shot the victim once in the chest. According to Ms. Garrison, "[e]verybody freaked out." Defendant went and stood over the victim, who was on the floor, "said [']sorry, Tez, you was a good dude,['] and shot him again." Ms. Garrison could not see Tez's body, but she believed that Defendant shot him in the head.

Ms. Garrison and the other defendants then got into a car driven by Josh Davis and left. Ms. Garrison was not aware of anything being taken from the victim.

On cross-examination, Ms. Garrison admitted that she had used cocaine before leaving with the victim. She denied sending a text to Mr. Page that she was being raped and needed help. She agreed that one of her codefendants had a 9 millimeter gun and the other had a .45 caliber and that they did not exchange weapons. She admitted that she lost a pair of flip-flops in the parking lot as she was running to the car. Ms. Garrison testified that she was in shock and denied that there had been a plan to rob anyone that night. Ms. Garrison stated that she had received multiple threats about testifying from both of her codefendants, as well as other people in the same gangs as Defendant, "Crip and GD."

The jury convicted Defendant as charged of first degree felony murder and attempted especially aggravated robbery. The trial court imposed a life sentence for the felony murder conviction. After a sentencing hearing, the trial court imposed a Range I sentence of twelve years for the attempted especially aggravated robbery conviction. The twelve-year sentence was run concurrently with the life sentence but consecutively to a sentence in an unrelated case. Defendant filed a motion for new trial, which was denied by the trial court. Defendant filed a timely notice of appeal.

## I. Sufficiency of the Evidence

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The relevant question is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). Questions concerning the "'credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact.'" *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Id.* "'A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory.'" *Id.* (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). Therefore, the prosecution is entitled to the "'strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). The standard of review is the

same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).[1]

As relevant to this case, first-degree felony murder is the killing of another during the perpetration or attempt to perpetrate any robbery. T.C.A. § 39-13-202(a)(2). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a). Robbery becomes especially aggravated when it is accomplished with a deadly weapon and results in serious bodily injury. T.C.A. § 39-13-403(a).

> A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

T.C.A. § 39-12-101(a)(3). "[T]he person's entire course of action" must be "corroborative of the intent to commit the offense" in order to constitute a substantial step. *Id*. at (b).

Although not challenged by Defendant, we note that a conviction may not be based solely upon the uncorroborated testimony of an accomplice. *State v. Jones*, 450 S.W.3d 866, 888 (Tenn. 2014); *State v. Collier*, 411 S.W.3d 886, 894 (Tenn. 2013). However, the longstanding rule has been that only slight corroboration of an accomplice's testimony is required. *See Hawkins v. State*, 469 S.W.2d 515, 520 (Tenn. Crim. App. 1971). Our supreme court has explained the corroboration requirement as follows:

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also

---

[1] Defendant relies on an outdated standard of review that circumstantial evidence must weave "a web of guilt" around a defendant and "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant" in order to sustain a conviction. *See State v. Crawford*, 470 S.W.2d 610, 612 (Tenn. 1971). However, the Tennessee Supreme Court specifically overruled that standard in *Dorantes*, wherein it held that circumstantial evidence "is intrinsically no different" from direct evidence. 331 S.W.3d at 380; *see also State v. Smith*, 436 S.W.3d 751, 764 (Tenn. 2014) (reiterating that "[c]ircumstantial evidence is sufficient to sustain a defendant's conviction even if the evidence does not remove every reasonable hypothesis except that of guilt") (internal quotation omitted).

include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001) (quoting *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994)). "In short, the evidence must confirm in some manner that (a) a crime has been committed and (b) the accused committed the crime." *State v. Griffis*, 964 S.W.2d 577, 589 (Tenn. Crim. App. 1997). Corroboration of an accomplice's testimony cannot come from the testimony of another accomplice. *State v. Boxley*, 76 S.W.3d 381, 386 (Tenn. Crim. App. 2001) (citing *State v. Green*, 915 S.W.2d 827, 831 (Tenn. Crim. App. 1995)). The sufficiency of the corroborating evidence is a question for the jury. *Bigbee*, 885 S.W.2d at 804.

In this case, the trial court instructed the jury that both Mr. Page and Ms. Garrison were accomplices as a matter of law. *See Jones*, 450 S.W.3d at 888 (holding that an accomplice is "one who knowingly, voluntarily, and with common intent with the principal unites in the commission of a crime"). Mr. Page's testimony that the trio planned to rob the victim was corroborated by the testimony of Ms. Mathis. Defendant's identity as one of the robbers who forced their way into the victim's motel room was corroborated by his handprint on the outside of the motel room door. Thus, there was adequate corroboration that a crime was committed and that Defendant was implicated in it.

Defendant argues that the evidence is insufficient to sustain his convictions because there was no proof that anything was taken from the victim, including over $4000 in cash that was still in his wallet. However, Defendant was convicted of attempted especially aggravated robbery, which requires only that he act with intent to commit a robbery and take a substantial step toward the commission of a robbery, not that he actually complete a robbery. Additionally, felony murder can be established if the killing occurred during an attempt to commit a robbery. In the light most favorable to the State, the evidence shows that Defendant, Mr. Page, and Ms. Garrison concocted a plan to rob the victim after the victim sent Ms. Garrison a picture of a large sum of money. Mr. Page testified that Defendant specifically said he was "fixing to get this money." After Ms. Garrison told Defendant and Mr. Page her location, the two men barged into the motel room with their faces covered by bandanas, brandishing guns and shouting "give me the money." This entire course of conduct, up to the point where the victim was shot and the defendants fled, is clearly corroborative of Defendant's intent to commit a robbery. The fact that Defendant was unsuccessful in obtaining the victim's money, hidden under the mattress, is irrelevant.

- 10 -

Defendant also appears to argue that first degree murder, including felony murder, is defined as the "premeditated and intentional killing of another." However, felony murder does not require the State to prove the element of premeditation. *See* T.C.A. § 39-13-202(a); *State v. Ely*, 48 S.W.3d 710, 721 (Tenn. 2001) (holding that "[t]he mental state required for the commission of felony murder is intent to commit the alleged felony," which "is a different mental state than that required for premeditated murder"). Additionally, Defendant appears to argue that the evidence is insufficient because Garrison's preliminary hearing testimony indicated that "[Mr.] Page fired the fatal shot that struck and killed the victim." However, the jury was free to discredit this portion of her testimony and accredit the testimony of Mr. Page that Defendant shot the victim twice, which was corroborated by the fact that all of the ammunition found at the scene came from a single Hi-Point 9 millimeter gun. *See State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005) (holding that the jury may determine which witnesses and which portions of a witness's testimony to believe or disbelieve). Moreover, even if the jury did believe Ms. Garrison's testimony, the evidence is still sufficient to support Defendant's conviction for felony murder under a theory of criminal responsibility. *See* T.C.A. § 39-11-402(a)(2). "A defendant who is a willing and active participant in a robbery becomes accountable for all of the consequences flowing from the robbery and may be convicted of first-degree murder where a co-perpetrator of the felony is the actual killer." *State v. Middlebrooks*, 840 S.W.2d 317, 336 (Tenn. 1992). The evidence is sufficient to support Defendant's convictions for both felony murder and attempted especially aggravated robbery.

## *II. Improper Prosecutorial Argument*

Defendant argues that "[t]he State committed prosecutorial misconduct during closing argument by telling the jury that the Defendant had twisted the truth and was hiding the truth from them and was being dishonest." He asserts that "the prosecutor accused the [Defendant] of intentionally misstating the evidence and attempting to mislead the jury, expressed his personal belief or opinion as to the truth or falsity of any testimony or evidence and the guilt of the [D]efendant[,] . . . tried to inflame the jury against the [Defendant,] and tried to divert the jury from issues other than the guilt or innocence of the [Defendant]." The State responds that this issue is waived because Defendant failed to object at trial. Additionally, the State argues that the prosecutor's argument was not improper because he was responding to defense counsel's mischaracterizations of the evidence rather than attacking the credibility of Defendant or any of the witnesses.

At the beginning of his rebuttal closing argument, the prosecutor stated "It's hard to sit back there and be quiet when you hear stuff like you just heard. [Defense counsel] talks about twisting the truth. He talks about dishonesty. And the defense is the only one

here that is twisting the truth." The prosecutor addressed defense counsel's argument that Ms. Mathis was a dishonest person because of her convictions for theft and vandalism. The prosecutor then addressed defense counsel's argument that the jury should believe Ms. Garrison's preliminary hearing testimony and defense counsel's mischaracterization of that testimony with regard to the gang affiliations of each of the codefendants. "Twisting the truth, that's exactly what the [D]efendant is doing, through his attorney, [defense counsel]. You can't believe anything that this man says, nothing." The prosecutor then compared Ms. Garrison's preliminary hearing testimony and Mr. Page's trial testimony, explaining that the other evidence and testimony corroborated Mr. Page's account of what happened that night. "She's not telling the truth. I can't put someone on the stand that I know is not telling the truth. I can't do that." At no point did Defendant raise an objection.

Closing argument is "a valuable privilege that should not be unduly restricted." *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001). Closing arguments "have special importance in the adversarial process," allowing the parties "to present their theory of the case and to point out the strengths and weaknesses in the evidence to the jury." *State v. Banks*, 271 S.W.3d 90, 130 (Tenn. 2008). Attorneys "should be given great latitude in both the style and the substance of their arguments." *Id.* at 131. Our supreme court has recognized that "prosecutors, no less than defense counsel, may use colorful and forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence, or make derogatory remarks or appeal to the jurors' prejudices." *Id.* (internal citations omitted). "[A] prosecutor's closing argument must be temperate, must be based on the evidence introduced at trial, and must be pertinent to the issues in the case." *Id.*

Although not exhaustive, Tennessee courts have recognized five general areas of potential improper prosecutorial argument: (1) intentionally misstating the evidence or misleading the jury as to the inferences it may draw; (2) expressing personal beliefs or opinions as to the truth or falsity of any testimony or the guilt of the defendant; (3) inflaming or attempting to inflame the passions or prejudices of the jury; (4) injecting issues broader than the guilt or innocence of the accused; and (5) arguing or referring to facts outside the record unless the facts are matters of common knowledge. *State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003). If the prosecution's argument is found to be improper, relief may only be granted when "the conduct was so improper or the argument so inflammatory that it affected the verdict to the [defendant's] detriment." *Id.* at 5. When measuring the prejudice caused by the argument, we consider: (1) the facts and circumstances of the case; (2) any curative measures undertaken by the court and the prosecutor; (3) the intent of the prosecution; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case. *Id.* "A criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument." *Banks*, 271 S.W.3d at 131.

- 12 -

Although Defendant raised the issue of improper prosecutorial argument in his motion for new trial, he did not make a contemporaneous objection at trial. Our supreme court has stated "that it is incumbent upon defense counsel to object contemporaneously whenever it deems the prosecution to be making improper argument." *State v. Jordan*, 325 S.W.3d 1, 57 (Tenn. 2010). A timely objection gives the trial court the opportunity to assess the State's argument and to take appropriate curative action. *Id.* at 57-58. Failure to contemporaneously object constitutes a waiver of the issue on appeal. *Id.* (citing Tenn. R. App. P. 36(a)); *see State v. Scarborough*, 300 S.W.3d 717, 731-32 (Tenn. Crim. App. 2009) (holding that allegations of improper prosecutorial argument were waived when defendant failed to object even though he included it in motion for new trial).

However, this Court may, in our discretion, review an issue that has been waived for plain error. *See* Tenn. R. App. P. 36(b); *State v. Bishop*, 431 S.W.3d 22, 44 (Tenn. 2014) (noting that "the discretionary authority to invoke the plain error doctrine should be 'sparingly exercised'"). To establish plain error, Defendant has the burden of establishing the following factors:

> (a) the record clearly establishes what occurred in the trial court; (b) a clear and unequivocal rule of law has been breached; (c) a substantial right of the accused has been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

*State v. Martin*, 505 S.W.3d 492, 504 (Tenn. 2016). All five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established. *Bishop*, 431 S.W.3d at 44. Even if all five factors are present, "the plain error must be of such a great magnitude that it probably changed the outcome of the trial." *Id.* (quoting *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994)). In other words, to obtain relief, Defendant would have to show that the prosecutor's allegedly improper argument was "especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." *State v. Page*, 184 S.W.3d 223, 231 (Tenn. 2006).

In his appellate brief, Defendant does not acknowledge that the issue is waived and does not expressly address any of the plain error factors. Defendant bears the burden of persuading this Court that the trial court committed plain error and that the error probably changed the outcome of the trial. *See Martin*, 505 S.W.3d at 505. Additionally, other than a conclusory statement that "[t]he State's final closing argument is replete with three (3) pages of improprieties," Defendant does not specifically identify which

statements were allegedly improper and makes only conclusory assertions as to how they were improper, thereby further risking waiver of the issue. *See* Tenn. R. Crim. Ct. App. 10(b). On the three pages of transcript cited by Defendant, the prosecutor is responding directly to defense counsel's closing argument that the State's witnesses "want to twist the truth to their own advantage" and addressing defense counsel's mischaracterization of the evidence as to whether Defendant had "stepped back from that gang thing." Although the prosecutor's statement as to why he did not call Ms. Garrison as a witness bordered on improper expression of personal belief as to the credibility of a witness, he justified this statement by pointing out the inconsistencies between Ms. Garrison's testimony and the physical evidence. *See State v. Carruthers*, 35 S.W.3d 516, 578 (Tenn. 2000) ("Nor should a prosecutor express his or her personal opinion about the credibility of witnesses, unless the comments are grounded upon evidence in the record."). The prosecutor did argue facts outside of the record when he stated that Ms. Mathis "could have received pretrial diversion or some first offender expungement" for her vandalism and theft convictions in response to defense counsel's suggestion that she was a dishonest person. However, Defendant has not shown that any of these statements by the prosecutor were so egregious and inflammatory that they probably affected the outcome of the trial, especially given the overwhelming strength of the State's case. Thus, consideration of any error is not necessary to do substantial justice. Defendant is not entitled to plain error relief.

*Conclusion*

Based on the foregoing, we affirm the judgments of the trial court.

_____
TIMOTHY L. EASTER, JUDGE

- 14 -